Heather C. Barden, WSBA #49316
Barden & Barden
P.O. Box 8663
Spokane, WA 99203
509.315.8089 (P)
509.381.2159 (F)
heather@bardenandbarden.net
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ANDREW M. RICHMOND, a Washington Resident,<br><br>    Plaintiff,<br><br>v.<br><br>SPOKANE COUNTY SHERIFF'S OFFICE, a division of Spokane County, Washington (a Washington State County),<br><br>    Defendant. | No.<br><br>**COMPLAINT** |

"[There is] a well-documented [] code of silence, *the thin blue line*, which discourages officers from reporting improper and unlawful conduct by fellow officers. Accordingly, accountability is challenging and mistrust of law enforcement

COMPLAINT: 1

abounds. There is much work to be done in changing the culture of police departments . . . ."[1] "[T]here is an "undercurrent" of prejudice or bigotry that must be addressed."[2]

This case involves just that - a Black law enforcement officer that reported racist comments and actions by a white law enforcement officer i.e., breached the code of silence aka "the thin blue line" by reporting a fellow officer. The white officer *was* terminated by their shared County employer. Yet, as a result of lodging the complaint about racism the Black officer faced further discrimination and retaliation to the point that his work environment became so intolerable that he had to quit and take a position with a significant cut in pay and rank. The Black officer's County employer failed to protect him against workplace discrimination and retaliation in violation of state and federal laws. Accordingly, there *must* be action taken to eliminate the code of silence - "the thin blue line" - and it needs to start now.

---

[1] Hodges, Ann C. and Justin Pugh, "Crossing the Thin Blue Line: Protecting Law Enforcement Officers Who Blow the Whistle." *UC Davis Law Review*, Vol 52:1 (2018) at 1.

[2] Quoting Kurtis Robinson, president of the Spokane chapter of the NAACP and The Spokesman Review. *See* https://www.spokesman.com/stories/2019/jun/13/spokane-county-sheriffs-sergeant-fired-for-racial-/ "*Spokane County sheriff's sergeant fired for racial slur, sexual harassment, talk of killing black people*" publication date: June 13, 2019 (last visited March 30, 2021).

COMPLAINT: 2

COMES NOW Plaintiff Andrew M. Richmond (hereafter, "Plaintiff" or "Richmond"), by and through his counsel of record Heather C. Barden of Barden & Barden, and hereby alleges and complains against Defendant Spokane County Sheriff's Department, as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is an individual who at all times relevant hereto was a resident of Spokane County, Washington.

2. Defendant Spokane County Sheriff's Office ("SCSO") is a division of the municipality of Spokane County, Washington.

3. Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b)(1) & (2) because all Defendants are residents of Spokane County, Washington and all acts alleged herein occurred in Spokane County, Washington.

4. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331, §1343, and §1367 as the chief complaints arise under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e, *et seq.* and the Washington Law Against Discrimination ("WLAD"), RCW 49.60, *et seq.* for racial discrimination and retaliation for engaging in a protected activity.

**RELEVANT FACTS**

5.  Richmond is a Black man who was formerly employed by the Spokane Sheriff's Department at the time the actions alleged herein occurred, Richmond was employed as a Deputy Sheriff. At all times during Richmond's employment with the Sheriff's Department, he was one of two Black officers employed by the Sheriff's Department.

6.  On information and belief, the SCSO has approximately 220 employed officers. Spokane County has an approximate population of 500,000 people as of 2015 United States Census Bureau Data. Only 2% of that population is Black and/or African-American. Only 12.9% of the remaining population is non-White.

7.  On or about December 22, 2016, Richmond was on duty. He responded to a call with fellow Deputy Tyler Kullman. After responding to the incident, Richmond and Kullman "road sided" their vehicles to have a discussion i.e., parking so that they could speak to each other with the driver's side windows directly across from one another. During this discussion, Richmond heard a phone conversation between Kullman and now-former Sergeant Jeffrey Thurman during which Thurman asked Kullman if Kullman was ready to "kill some niggers." Kullman and Thurman

COMPLAINT: 4

are white. Richmond does not know if the "call" was a voicemail, a live phone call, or a conversation sent via a smartphone application ("app"). He does know exactly what he heard.

8.  During or shortly after Kullman received the live or recorded message from Thurman, Thurman was told that Richmond was present and heard Thurman's abhorrent comments. Shortly thereafter, Thurman approached Richmond and told Richmond that Thurman had only been referring to "inner city" Black people who "riot and loot." Spokane County does not have an inner city. The only incidences of peaceful protest and "looting" that have occurred at any recent time in Spokane County occurred well after Thurman's comments – in 2020 during part of the worldwide Black Lives Matter protests in response to the officer-involved death of George Floyd in Minnesota.

9.  Richmond, shaken by Thurman's comments, was not quite sure what to do. Thurman at the time was a beloved local officer and handler of well-known K-9 Laslo and had been employed by the SCSO since 2001. On multiple occasions between 2016 and 2018, Richmond reported Thurman's racist comments to SCSO Sergeants Justin Elliott, Damon Simmons, and Andrew Buell. Simmons was the only

COMPLAINT: 5

other Black officer employed by the SCSO. All three men were Richmond's superiors in the chain of command. In violation of SCSO policy, none of those officers reported Thurman's comments. At no time did Deputy Kullman report Thurman's comments to anyone.

10.     On or about May 2019, Richmond made a formal complaint to his union about Thurman's conduct and the discrimination and retaliation related to his application and interview for the Air Support Unit ("ASU"). In addition to Thurman's "kill some niggers" comment, Richmond reported other retaliatory actions taken against Richmond from the date he overheard the comments to the date of his formal complaint.

11.     Before the formal complaint was filed with the union, Richmond reported the ASU issue to then-Union President Kevin Richey. Richmond also told Richey about Thurman's racist comments. Richey contacted then-Undersheriff David Ellis, who oversaw the ASU selection process. Ellis told Richey that Richmond had "too many" other specialty positions, so he did not receive the ASU appointment. Ellis' statement was untrue pretext. At the time, Richmond had zero specialty positions. Ellis told Richey that Thurman ultimately got to decide who

COMPLAINT: 6

received the ASU position. On information and belief, Ellis and Thurman had, and have a close personal relationship. In response to Richmond's complaint, an Internal Affairs ("IA") investigation was started.

12.     During the course of the IA investigation, multiple SCSO officers were interviewed. Kullman made clear to IA investigators that he had a "very close, personal relationship" with Thurman. Kullman "could not recall" any specific incidents, but told IA that Thurman regularly used the word "nigger" both in anger and in jest. At no time did Kullman ever report those incidents. Kullman reported to IA that Thurman often "talked about killing African Americans" and calling Black people "niggers" when discussing the Black Lives Matter movement. Deputy Veronica Van Patten reported to IA investigators that she had overheard Thurman use the word "nigger" in reference to Black men on multiple occasions while on the job. Van Patten also reported incidents of on-the-job sexual harassment against another female Deputy by Thurman during this IA investigation.

13.     Richmond was interviewed by IA Investigator Sergeant Hines on or about May 8, 2019. Richmond explicitly told Hines that he was the subject of racial

COMPLAINT: 7

discrimination and retaliation related to his application and interview for the Air Support Unit ("ASU") after the Thurman-Kullman incident.

14. Richmond informed Hines that one of the officers awarded the position, Deputy Krystal Bitzer, told Richmond that her ASU interview was informal, describing it as "BS'ing with the other board members" making the hiring decision. She told Richmond that she was asked "no real questions."[3] In fact, she was given the answers in advance of her interview to potential questions by "ASU members." In contrast, Richmond was asked a series of hard questions. Thurman was involved in the ASU interview process and was made a part of the ASU team during the interviews.

15. Had Richmond received the ASU position; he would have received a substantial amount of overtime and training. The increased income and training would have amounted to a promotion. Richmond was not formally notified that he was not selected for the ASU position. Richmond was instead told in person by Sergeant Patrick Bloomer that SCSO "command staff" prevented Richmond from

---

[3] Bitzer, like Van Patten, had reported sexually harassing comments made to her by Thurman, including words to the effect that she would return from a work trip "pregnant" after having to "share a room" with Thurman – her supervisor.

COMPLAINT: 8

receiving the ASU position for an "unknown" reason. Bloomer told Richmond to "keep his mouth shut" about not getting selected. It is SCSO practice to notify interviewees by email or a phone call of non-selection; interviewees are never notified in a closed-door setting. In violation of SCSO policies, the score sheets from the ASU interviews were not preserved. Bloomer told Richmond that if he complained, he would be passed over in the future. Bloomer has denied this conversation despite public records corroborating Richmond's claim.

16. Elected Sheriff Ozzie Knezovich refused to allow Ellis to be interviewed as part of the IA investigation into Thurman's conduct. Hines personally told Richmond that Knezovich refused to allow Ellis to be interviewed. Shortly thereafter, Knezovich personally terminated the IA investigation. Knezovich told Hines words to the effect that the investigation was "dead."

17. Knezovich deemed Richmond's retaliation complaint related to the ASU position "unfounded." Knezovich has since testified that he had no reason to doubt that Richmond was telling the truth about Thurman's racist comments. On June 12, 2019, Richmond personally told Knezovich that Ellis needed to be interviewed, raising concerns about Ellis' relationship with Thurman.

COMPLAINT: 9

18.     On or about June 13, 2019, Thurman was advised that he was being terminated as a result of the IA investigation. Thurman refused to participate in his own *Loudermill* hearing in response to the proposed termination.

19.     Knezovich held a press conference on or about June 13, 2019 regarding Thurman's termination. The press conference was covered by *The Spokesman-Review* in an article released the same date online, authored by Chad Sokol. During the press conference, Knezovich stated that Thurman's "type of behavior will never be tolerated…It's reprehensible, and any deputy who dishonors this community and his badge this way, they will not work for the Spokane County Sheriff's Office." In the same interview, Knezovich told the paper that the supervisors Richmond had reported Thurman's comments to "should have brought it forward…These things have to be sent up the chain, and they have to be dealt with."[4] Importantly, Knezovich said that Thurman refused to accept responsibility, instead, he "mitigated and blamed people, blamed victims." A press release made on or about the time of Thurman's termination stated that Knezovich initiated the IA investigation, which is untrue.

---

[4] Knezovich also affirmed the "coming back pregnant" comments in this interview regarding Bitzer.

COMPLAINT: 10

20.	Unfortunately, Knezovich failed to protect Richmond after Thurman was terminated. Shortly after the press conference, members of the community began making public accusations against Thurman's complainant, Richmond. On the same date, June 13, 2019, SCSO circulated a memo that was read out loud to all SCSO employees in which Richmond was identified by name as the complainant. Richmond was in a meeting with approximately 25 SCSO deputies on that day when Lieutenant Mike Zollars read the memo aloud and named Richmond. Other deputies told Richmond that they had been read the memo at similar meetings. During the course of the IA investigation, Richmond had been repeatedly assured that his name would not be released. Richmond immediately began being questioned by co-workers as to why he "randomly" reported Thurman.

21.	On or about June 20, 2019, Richmond was informed that ASU members had listened to the audio recordings of the IA interviews. Richmond was also told that his own interview was discussed in a group setting. Richmond reported this to Hines, who advised that the Thurman investigation was "closed" – failing to account for the new, retaliatory behavior and improper review of a completed IA investigation.

COMPLAINT: 11

22. Shortly thereafter, Richmond urged Richey to request that the IA investigation be continued, at least as to the ASU allegations. Richey told Richmond that Lieutenant Steve Jones had been assigned to the ASU investigation. When asked, Jones told Richmond that he "had no clue" what Richmond meant about the ASU investigation.

23. After the investigation, Richmond learned that Spokane Valley Chief Mark Werner and Spokane Valley Commander Matt Lyons both had ongoing, close relationships with Thurman. Werner and Lyons, in retaliation, spread rumors about Richmond to SCSO staff. Lyons vocally supported Thurman's use of the word "nigger," and Lyons made clear that the comment about "killing niggers" was not a policy violation in his view. Chief Werner began circulating a false rumor that Richmond was having a sexual relationship with Van Patten, one of Richmond's former recruits. Richmond was employed at the Spokane Valley office at this time and Lyons and Werner were in Richmond's direct chain of command.

24. On or about July 8, 2019, Knezovich called Richmond to discuss accusations made against Richmond by Chief Werner. Knezovich's call violated SCSO policy, violated Richmond's rights to an IA investigation of any accusation,

COMPLAINT: 12

and violated Richmond's rights as a union member. During this call, Richmond told Knezovich about Lyons' and Werner's comments disregarding the use of "nigger" as a policy violation. Richmond also told Knezovich that he did not feel comfortable working for Lyons. Knezovich decided to move and isolate Richmond to the downtown SCSO office. The move was not voluntary – it was in response to the retaliatory, hostile work environment created by Richmond's superiors. No disciplinary actions were ever taken against Lyons or Werner. Since the termination of Thurman Richmond has had a target on his back.

25. Thurman also reported information to current SCSO personnel after his termination in an attempt to discredit and intimidate Richmond and to cause Richmond emotional distress. By way of example, Richmond obtained text messages among Thurman, Bloomer, and Kullman, as well as other unidentified SCSO personnel. One person on the text group stated, "now everyone is being gay…wait…is that wrong?' The message was in response to Thurman saying, " Let me clarify not brothers like a racial thing but brother by blood just to be clear" "because God forbid, we say anything nowadays." A number of the SCSO personnel on the text thread used their work phones to participate in these communications.

COMPLAINT: 13

26. On or about July 29, 2019 Richmond quit his SCSO job due to the ongoing retaliation. He took a substantial pay cut and lost his rank by moving to a probationary position with the Spokane Police Department to leave the toxic SCSO culture.

27. The rumors from the SCSO continue to this day. In or around May 2020, Deputy Jeffrey Getchell made comments in a group setting during a hostage negotiation training, suggesting that Richmond got Thurman fired. Getchell alleged that Richmond had also engaged in an affair in his personal life. The SCSO and the County have done nothing to stop the damage to Richmond's reputation.

## NOTICE OF RIGHT TO SUE

28. Plaintiff has filed a timely charge of discrimination and retaliation with the Equal Employment Opportunity Commission and brings this action within ninety (90) days of the Notice of Right to Sue letter sent on February 12, 2021.

## FIRST CAUSE OF ACTION

### DISCRIMINATION BASED ON RACE
### (Title VII, 42 U.S.C. §2000e-2 and WLAD, RCW 49.60.180)

29. Richmond realleges the preceding paragraphs as if fully set forth herein.

COMPLAINT: 14

30.     Richmond faced race-based discrimination as a result of his reports of the racist comments of an SCSO employee, Thurman. Richmond was made to endure harassment, rumors, and comments such as "killing niggers," and told that such comments did not violate any SCSO policies. The harassment, rumors, and comments were made by inferior, lateral, and most often superior SCSO employees in violation of Title VII and the WLAD. In addition, the SCSO named Richmond as the complainant to all SCSO employees in violation of its own IA policies and refused to investigate Richmond's discriminatory complaints.

31.     As a direct and proximate result of the SCSO's intentional and blatant racial discrimination, Richmond has sustained damages including economic loss, mental anguish and emotional distress, and other damages in an amount to be proven at trial. The conduct of the SCSO was outrageous and malicious, was intended to injure Richmond, and was done with reckless indifference to Richmond's protected civil rights.

## SECOND CAUSE OF ACTION

### RETALIATION
### (Title VII, 42 U.S.C. §2000e-3 and WLAD 49.60.030)

32.     Richmond realleges the preceding paragraphs as if fully set forth herein.

COMPLAINT: 15

33. After Richmond filed a complaint against Thurman, and immediately after Thurman was terminated, Richmond was officially named to the entire SCSO staff as the complaint in the Thurman IA investigation. Richmond has been, and upon information and belief, still is harassed by SCSO leadership. The SCSO has done nothing but permit this conduct to continue. The SCSO retaliated against Richmond after his complaint against Thurman, by and through its current and former employees by improperly passing him over for a promotion and continuing to allow – even encouraging – a racist culture. SCSO allowed the behavior to continue unchecked until Richmond was moved from a facility where his supervisors openly belittled his complaints about race issues until he quit the SCSO because of the hostile work environment.

34. As a direct and proximate cause of the SCSO's retaliation, Richmond has sustained damages consisting of economic loss, mental anguish and emotional distress, and other damages in an amount to be proven at trial. The conduct of the SCSO was outrageous and malicious, was intended to injure Richmond, and was done with reckless indifference to Richmond's protected civil rights.

COMPLAINT: 16

# THIRD CAUSE OF ACTION

## CONSTRUCTIVE DISCHARGE
### (Washington Common Law)

35. Richmond realleges the preceding paragraphs as if fully set forth herein.

36. Richmond faced retaliation and harassment for reporting Thurman's racist comments and initiating an IA investigation against Thurman. Richmond reported to the elected Sheriff, Knezovich, that he continued to face retaliation from others, including his direct chain of command (Lyons and Werner) because of the Thurman investigation. Knezovich and the County did nothing to protect Richmond. Instead, Richmond was moved from the Valley location where the hostile work environment persisted until Richmond had no choice but to quit.

37. As a direct and proximate cause of the SCSO's hostile work environment and failure to protect Richmond, he has suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Richmond requests the following relief:

COMPLAINT: 17

38. Damages, including economic damages, emotional distress damages, and mental anguish damages, and any other damages in an amount to be proven at trial.

39. Pre- and post-judgment interest.

40. Costs and attorneys' fees pursuant to applicable statute or as equity requires, including, but not limited to 42 U.S.C. § 2000e-5(k) and RCW 49.60.030.

41. Punitive damages pursuant to 42 U.S.C. § 1981a.

42. Damages for adverse tax consequences resulting from any damage award, in an amount to be proven at trial.

43. All other relief that this Court deems reasonable, necessary, and just sounding in law or equity.

## JURY DEMAND

Plaintiff requests trial by jury in this action.

DATED this 30th day of March 2021.

BARDEN & BARDEN PLLC

*s/ Heather C. Barden*
Heather C. Barden, WSBA #49316
Attorneys for Plaintiff

COMPLAINT: 18